## BOURDIEU v. PACIFIC WESTERN OIL CO. et al.

District Court, S. D. California, N. D.
Oct. 1, 1934.

408

Chandler, Wright & Ward, of Los Angeles, Cal. (Howard W. Wright and A. B. Dorman, both of Los Angeles, Cal., of counsel), for complainant.

Morrison, Hohfeld, Foerster, Shuman & Clark, of San Francisco, Cal. (Herbert W. Clark, of San Francisco, Cal., of counsel), for Pacific Western Oil Co.

Pillsbury, Madison & Sutro, of San Francisco, Cal. (Felix T. Smith, of San Francisco, Cal., of counsel), for Kettleman Oil Corporation.

George W. Nilsson, of Los Angeles, Cal., for Kettleman North Dome Ass'n.

Brobeck, Phleger & Harrison, of San Francisco, Cal. (Herman Phleger, of San Francisco, Cal., of counsel), for Frank Kennedy.

Orrick, Palmer & Dahlquist, of San Francisco, Cal. (W. J. Kenney, of San Francisco, Cal., of counsel), for Franklin R. Kenney.

McCORMICK, District Judge.

This is a suit in equity whereby the complainant, Jean Bourdieu, seeks to impress a trust in his favor upon an oil and gas lease issued by the United States on October 4, 1929, to defendants Kettleman Oil Corporation and Pacific Western Oil Company, a corporation, under the Leasing Act of February 25, 1920 (section 1 et seq., 41 Stat. 437).

The lease grows out of a prospecting permit granted by the government on May 28, 1921, under said Leasing Act to one Thomas M. Crum. Both the prospecting permit and the lease cover an area within which the land claimed by the complainant is situate. By transfers, assignments, and by the production of oil in paying quantities from the area covered by the prospecting permit the two aforesaid corporations have succeeded to rights of the permittees, and as above stated are the lessees named in the lease. The only portion of the leased area that is involved in this case is situate in Fresno County, Cal., and consists of 322.89 acres described as "Lots 1 and 2, E½ of the NW¼ of the NE¼ of Section 30, Township 21 South, Range 17 East, Mt. Diablo Meridian."

There is no claim of any fraud. There is no contention that at any time any fiduciary relationship existed between complainant and any of the defendants named in the bill. It is admitted that Bourdieu has not at any time attempted to obtain from the United States an oil and gas prospecting permit or an oil and gas lease relating to the lands that he claims in this suit, and the complainant does not assert that any of the defendants fraudulently prevented him from obtaining from the government either a prospecting permit or an oil and gas lease on the premises that are involved herein.

It is contended by the complainant that the said two corporations hold the lease in so far as it covers the land here involved in trust for Bourdieu, and that the defendants should be required in equity to transfer it to him because at the time the defendants acquired the lease from the United States the complainant had under section 20 of said Leasing Act of February 25, 1920 (30 USCA § 229), the preferential and exclusive right to any oil and gas lease that could be issued upon the said area. Section 20 of the Leasing Act, as far as it relates to this case reads: "In the case of lands bona fide entered as agricultural, and not withdrawn or classified as mineral at the time of entry, * * * the entryman or patentee, or assigns, * * * if the entry has been patented with the mineral right reserved, shall be entitled to a preference right to a permit and to a lease, as herein provided, in case of discovery. * * *"

In order for the complainant to compel defendants to transfer their lease to him he must show: (1) That he in good faith entered the lands as agricultural lands under a belief that he would ultimately receive title to both the surface and mineral deposits of the lands entered; and (2) he must also prove that at the time of his entry the lands that he entered were not then withdrawn as mineral lands, or not then classified as mineral lands.

I find that the lands claimed were at the time of Bourdieu's homestead entry both withdrawn from entry as being petroleum lands and classified as such, and therefore that complainant has established no right in or to the oil and gas lease in suit. It is undeniable that oil lands or petroleum lands are mineral lands within the meaning of laws relating to mineral lands and the acquisition of title therein; the term mineral being used and applied in a popular sense. Burke v. S. P. R. Co., 234 U. S. 677, 34 S. Ct. 907, 58 L. Ed. 1527. I further find that although Bourdieu in good faith entered the lands as agricultural lands, he did not do so under a belief that he would ultimately receive title to both the surface and the mineral deposits of the lands entered.

The complainant, Jean Bourdieu, is a sheep raiser. Since 1914 he has been grazing his flocks in Kettleman Hills, Cal., and upon and about the land in suit. On March 6, 1919, he filed application and made entry upon the above-described land as a homestead under the Act of February 19, 1909, 35 Stat. 639, as amended (43 USCA §§ 218, 646). In his application Bourdieu asserted that the area was nonmineral and agricultural in character, and stated that his homestead entry was "subject to provisions and reservations and limitations of Act of July 17, 1914." Thereafter, and on October 7, 1925, a patent to said land was issued by the United States to Bourdieu. The patent recites that the grant is made subject to certain rights that are immaterial to the consideration of this case, and "Also excepting and reserving to the United States all the oil and gas in the lands so patented, and to it, or persons authorized by it the right to prospect for, mine, and remove such deposits from the same upon compliance with the conditions and subject to the provisions and limitations of the Act of July 17, 1914 (38 Stat. 509 [30 USCA §§ 121 and note, 122, 123])."

On December 30, 1910, upon the recommendations of the Acting Director of the Geological Survey and the Acting Secretary of the Interior that were based upon information received by those governmental officials from the field that indicated that certain lands in the public domain are valuable for oil, President Taft, pursuant to express authority of an act of Congress dated June 25, 1910, and known as the Pickett Act (36 Stat. 847) [see 43 USCA §§ 141–143], made and promulgated an executive mandate, which as far as it pertains to this controversy reads as follows:

"Order of Withdrawal.

"Petroleum Reserve No. 16—California No. 7.

"It is hereby ordered that the following described lands be, and the same are hereby withdrawn from settlement, location, sale or entry, and reserved for classification and in aid of legislation affecting the use and disposal of petroleum lands belonging to the United States, subject to all of the provisions, limitations, exceptions, and conditions contained in the Act of Congress entitled 'An Act to authorize the President of the United States to make withdrawals of public lands in certain cases,'

"Approved June 25, 1910:

"Mt. Diablo Meridian, California.

"T. 21 S., R. 17 E., Sec. 30, all:

"Oil—California No. ⑧, p. 3.

"The area involved in this order is 18,480 acres, which will make a total area of petroleum withdrawals outstanding in California of 2,626,986 acres.

"Wm. H. Taft, President."

It should be noted that under the terms of section 1 of the Pickett Act (43 USCA § 141), supra, all "withdrawals or reservations" of public lands by the President remained in force until revoked by him or by an act of Congress.

There is no evidence before this court that at any time the Taft withdrawal order of December 30, 1910, as far as it relates to the area in suit, was ever revoked by the President, and there was no congressional legislation that affected the Pickett Act in any way that concerns this case until July 17, 1914, when "An act to provide for agricultural entry of lands withdrawn, classified, or reported as containing * * * oil, gas" and other nonmetallic minerals became law (38 Stat. 509).

It is clear from the wording of the presidential order of December 30, 1910, that no entry under the nonmineral land laws, and no location under the mineral land laws, could be validly made upon any of the withdrawn lands until a revocation by the Executive, or by the legislative department of the government, occurred, and when consideration is given to the undeniable situation that no change in the availability for entry of any of the withdrawn lands involved in this section occurred until the aforesaid Act of July 17, 1914, it follows that no right of any kind by any person whatever in the land described in the withdrawal order could exist or be established until what might be characterized as the Enabling Act of July 17, 1914, became effective. It is therefore solely upon such act that any claim of a preferential right to an oil lease can be made by complainant to any part of said Section 30 that was withdrawn from any entry.

Before considering the restricted right of entry that the Act of July 17, 1914, created, it should be noted that Section 30 in controversy here was actually not only wholly withdrawn and detached from the existing public domain by the presidential edict of December 30, 1910, but I think it is clear that it was also classified as oil land by such withdrawal order. Unless we delete and expunge the words and expressions "Petroleum Reserve," "petroleum lands," "Oil," "Area involved in this order is 18,480 acres, which

will make a total area of petroleum withdrawals outstanding in California of 2,626,-986 acres" from the order, the document amounts to nothing less than a classification of all of the section of land in which the area in suit is located as oil land and withdraws such oil land from all entry or acquisition. It stamped the land as prima facie mineral in character. Utah v. Lichliter, 50 L. D. 231. In interpreting an executive proclamation, all words used should be considered and given ordinary and natural meaning. Mason v. U. S., 260 U. S. 545, 43 S. Ct. 200, 67 L. Ed. 396.

■ The history of the times preceding and concurrent with the promulgation of the order of December 30, 1910, also establishes beyond doubt that the land involved in this controversy was classified as oil land by the presidential action of that date. It is futile to argue since the passage of the Pickett Act that the President is without power to withdraw and classify lands in the public domain. Indeed the Supreme Court in the Midwest Case (U. S. v. Midwest Oil Co.), 236 U. S. 459, 35 S. Ct. 309, 59 L. Ed. 673, in no uncertain language sustained this presidential power even without an express authorization from Congress.

Under the act establishing the duties of the Executive Agency of the Geological Survey (20 Stat. 394), its functions include "the classification of the public lands and examination of the Geological Structure, mineral resources and products of the national domain."

■ A few days prior to the issuance of the December 30, 1910, order, "The Land Classification Board, Oil Section of the Geological Survey," formally met, and after considering evidence that had been recently obtained in the field which consisted partly of the drilling of deeper and new wells it was decided that Section 30 in suit with other areas should be classified as oil lands. This decision was contrary to an opinion that had been reached in 1907 from studies that had been made in the field at and prior to that time. It is clear from the record that President Taft in issuing the order of December 30, 1910, did so upon the aforesaid latest findings and classifications of the Department of the Interior that characterized the land in suit as oil land. I do not agree with plaintiff's contention that in order for land to be classified as oil land within the meaning of the laws of the United States that pertain to this suit, it must have a known character as oil land as of the date of inquiry.

I think that the Director of the Geological Survey in his letter of June 17, 1908, that was introduced by the plaintiff, correctly described the only requirements of classification as follows: "In dealing with oil lands it must be borne in mind, however, that absolute determination, by work on the surface, of the occurrence or non occurrence of oil in any one locality is not possible. The best that can be done is to calculate the degree of probability on the basis of surface indications and structural conditions."

This test of classification appears to have been substantially the one sanctioned by the Supreme Court in West v. Edward Rutledge Timber Co., 244 U. S. 98, 37 S. Ct. 587, 590, 61 L. Ed. 1010: "Classification is characterization through the selection of some quality or feature, and therefore lands may be classified as pasture (grazing), timber, arable, or mineral. It is determined by surface indications. Minerals may be hidden under any surface, but a surveyor is not expected to explore for them, that he may include or exclude reference to them in his reports."

There are other authoritative governmental acts that show that at the time Bourdieu entered the homestead on March 6, 1919, the lands claimed by him had been declared to be, and classified as, oil lands.

Under the Pickett Act (section 3 [43 USCA § 143]) it is made the duty of the Secretary of the Interior to report all presidential withdrawals under such act to Congress at the next regular session after the respective withdrawals. Pursuant thereto, as shown by document 317, House of Representatives, Sixty-Second Congress, Second Session, and under date of December 8, 1911, said Secretary reported an area that included the Section 30 within which the Bourdieu homestead is located as having been withdrawn as petroleum lands. Here was a certification made to Congress by the officer whose statutory duty it was to report such matters that the land claimed by complainant was "petroleum" land that had been withdrawn from entry. Furthermore, as part of Bulletin 623 of the United States Geological Survey, issued and distributed by the government, there is a map annexed as plate II; on the face of this map these words appear, "Key map, State of California, showing location of oil land withdrawals outstanding on September 30, 1916," and in another place on the face of the map the following is printed, "Department of the Interior, Franklin K. Lane, Secretary, U. S. Geological Survey, George Otis Smith, Director. Map showing Petroleum Withdrawals out-

standing on September 30, 1916, in the State of California. Base Map enlarged from General Land Office Base Edition of 1907." The area involved in this suit is within the oil land withdrawals shown and described on this map. I am satisfied that under the case of West v. Edward Rutledge Timber Co., supra, this action of the Geological Survey constitutes classification of the lands claimed by Bourdieu as "Mineral." It thus appears that with no later change whatever in the status or classification of the land involved in this suit Bourdieu filed his entry on such land as an agricultural homestead on March 6, 1919. Because of the indisputable fact that the complainant Bourdieu filed his homestead entry subsequent to the withdrawal and classification of the lands entered as oil lands and in the entry and patent it is expressly stated that each is restricted subject to provisions and limitations of Act of July 17, 1914, I think no extended discussion or consideration of the scope and effect of that act is necessary.

It was undoubtedly legislation designed and intended to relieve bona fide agricultural entrymen from the stringent, drastic, and inequitable results of executive orders that entirely withdrew and classified lands as mineral. There were areas that could be profitably entered, occupied, and used as both agricultural and mineral, although they had been previously withdrawn or classified as oil lands. As to these, surface estates only were created. See Kinney-Coastal Oil Co. v. Kieffer, 277 U. S. 504, 48 S. Ct. 580, 72 L. Ed. 961. And there were also areas that prior to withdrawals or classification had been bona fide entered as agricultural lands, and where on account of the later executive action all rights of such entrymen were inequitably and seriously impaired and threatened with destruction. Section 1 of the act (30 USCA § 121) relates to the first type just mentioned; section 3 of the act (30 USCA § 123) to the second. It is obvious that the complainant does not come under the equitable protective features of section 3 of the act. His homestead entry and the subsequent patent that was issued to him if valid at all must have been granted under section 1. He made his entry after the lands had been withdrawn and classified as mineral, and both his entry and patent expressly reserved all oil and mineral rights to the United States to administer and dispose of according to law. Now in order to further carry out its intention and relieve bona fide agricultural entrymen who had made entries or obtained patent prior to the drastic executive withdrawals or classifications of their lands, the Congress, by section 20 of the Leasing Act of February 25, 1920, supra, invested such persons and only such persons with the preferential or exclusive right to any oil and gas prospecting permit or lease that should be granted by the United States covering their lands.

If the land involved was withdrawn or classified at the time of entry so that the entry was made with a reservation of the mineral, as is the case with the complainant, there is no preference right under the Leasing Act. This interpretation appears to have been the one established by the Regulations of the General Land Office as shown by circular No. 672 in evidence. I think it is the correct rule.

Inasmuch as it has been found that complainant is not entitled to any preferential right under the Leasing Act, I deem any finding on the issue of laches to be unnecessary. Nevertheless, it is considered proper to observe that the admitted delay of about three years by Mr. Bourdieu after his knowledge of the existence of the defendants' oil lease covering his homestead speaks forcefully against him in a court of equity. According to the evidence he idly sat by and through silent acquiescence encouraged the defendants to develop their lease and prove his homestead to contain oil in valuable quantities, and then at a late date, after speculating upon defendants' expensive explorations and activities, asks that the fruits of their labor and expenditures be transferred to him. His claim is stale and inequitable.

The case involves oil lands. Property rights in such areas should be asserted with celerity. A suitor cannot be allowed to remain passive, eager to appropriate the benefits of another's activity if success is achieved, or to assume an attitude of laissez faire if the other's efforts result in failure. Hayward v. Eliot National Bank, 96 U. S. 618, 24 L. Ed. 855. In Johnston v. Standard Mining Company, 148 U. S. 360, 13 S. Ct. 585, 37 L. Ed. 480, the Supreme Court held that the defense of laches was particularly applicable where the thing in dispute is mining property, which is of uncertain character and liable to suddenly develop a great increase in value. See, also, Patterson v. Hewitt, 195 U. S. 321, 25 S. Ct. 35, 49 L. Ed. 214, and Taylor v. Salt Creek Oil Co. (C. C. A. 8) 285 F. 532.

I find nothing in the bond requirement provisions of section 2 of the Act of July 17, 1914 (30 USCA § 122), that constitutes de-

fendants trespassers upon the land in question, and therefore not entitled to invoke the doctrine of laches against complainant. The opinion of Mr. Justice Van Devanter in Kinney-Coastal Oil Co. v. Kieffer, supra, contains illuminating and instructive matter on this issue.

Findings and decree pursuant to this memorandum for defendants, with costs. Solicitors for defendants will prepare, serve, and present same under the rules.